AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Indiana

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| MARY COSSEY | ) | 2:20-MJ-130 |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___12/26/13 - 1/16/19___ in the county of ___Lake___ in the ___Northern___ District of ___Indiana___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C., Sect. 1343 | Wire Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Jonathan Pressnell, Special Agent/FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  ___08/04/2020___

_____
*s/John E. Martin*
*Judge's signature*

City and state:  ___Hammond___

MAGISTRATE JUDGE JOHN E. MARTIN
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANT

I, Jonathan Pressnell, being duly sworn upon oath, state as follows:

I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since February, 2018. I am presently assigned to the Merrillville Resident Agency of the Indianapolis Division of the FBI and assigned to the Public Corruption Task Force ("PCTF"). This is a unit comprised of federal, state, and local law enforcement officers in Northwest Indiana, which investigates corruption of public officials in all branches of government as well as other white collar crimes. While assigned to the PCTF, I have gained experience with investigations into various levels of public corruption and other violations. Since becoming a law enforcement officer, I have received training and experience in investigative interview and interrogation techniques, arrest procedures, search and seizure, narcotics, white collar crimes, and other various other criminal matters. Based on this training and experience I have become familiar with the methods and techniques used by those individuals committing white collar crimes. Moreover I am a federal law enforcement officer who is engaged in enforcing criminal law and am authorized by the Attorney General to request a criminal complaint and arrest warrant.

I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). As such, I am empowered to conduct investigations of and make arrests for violations of U.S. criminal laws.

1

I am submitting this affidavit because I have probable cause to believe that MARY COSSEY has committed violations 18 U.S.C. § 1343 (wire fraud). This affidavit is submitted solely for the limited purposes of establishing probable cause against the defendant for the above described violations of federal law, and therefore contains only a summary of the relevant facts. I have not included every fact known by me in connection with this investigation. The statements contained in this affidavit are based on information I obtained from interviews of witnesses, my own observations and actions, information received from other law enforcement agents, my experience and training, and the experience of other agents working with me.

## RELEVANT STATUTES

Under Title 18, United States Code, Section 1343 (Wire Fraud), it is unlawful to, "having devised or intending to devise any scheme or artifice to defraud, or obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmit[] or cause to transmit[] by any means of wire . . . communication interstate . . . commerce, any . . . signals . . . for the purpose of executing such scheme or artifice."

## RELEVANT BACKGROUND ON BANKRUPTCY LAW

United States bankruptcy law is designed to balance two competing goals: (1) to relieve debtors of certain debt obligations they are unable to pay because of financial difficulties; and (2) to preserve the interests of creditors and other stakeholders by maximizing total creditor return in an orderly and efficient fashion. Bankruptcy petitions filed in the U.S. Bankruptcy Courts are governed by the Bankruptcy Code and accompanying rules and regulations. The U.S. Trustee serves

2

as an auxiliary to the Bankruptcy Court and oversees bankruptcy cases to prevent fraud, dishonesty and overreaching in the bankruptcy system. The U.S. Trustee works under the general supervision of the Attorney General.

A debtor initiates a bankruptcy proceeding by filing a voluntary petition with the Bankruptcy Court. In addition to the petition, the debtor must file schedules of her assets and liabilities, her current income and expenditures, a statement of her financial affairs, as well as other required documents. 11 U.S.C. § 521. These disclosure and filing requirements are necessary to: (a) ensure that the Trustee and the Court can properly administer and adjudicate the case; and (b) provide sufficient information to creditors to facilitate fair and efficient distribution of the debtor's income and assets. Filing for bankruptcy triggers an automatic stay on the commencement or continuation of all non-bankruptcy civil judicial proceedings against the debtor, with limited exceptions. 11 U.S.C. § 362. The automatic stay remains in effect until the bankruptcy case concludes, unless the Bankruptcy Court grants relief from the stay.

The Bankruptcy Code contains several methods of bankruptcy namely, liquidation, reorganization and adjustment of debts. Chapter 13 bankruptcy provides for the adjustment of debts with regular income. The purpose of Chapter 13 is to enable an individual debtor, under court supervision and protection, to repay her debts in installments over a prescribed period of time according to a court-approved plan. Chapter 13 plans are proposed by the debtor, and must be approved by the Bankruptcy Court. The court cannot approve a plan unless its payment terms provide

that all projected disposable income will be paid to the Chapter 13 trustee. 11 U.S.C. § 1325(b)(1)(B). In Chapter 13, "disposable income" is all income less prescribed amounts reasonably necessary for the maintenance and support of the debtor and her dependents, with an allowance for charitable contributions. 11 U.S.C. § 1325(b)(2). Put differently, in order to avail oneself of the benefits of Chapter 13 bankruptcy, the debtor is expected to live on a reduced budget and maximize recovery for unsecured creditors who will have no recourse after the court discharges their claims. A Chapter 13 debtor's disposable income during the plan term is property of the bankruptcy estate.

The duration of a Chapter 13 plan is three to five years. The debtor is permitted to keep possession of her home and car during the plan term if she continues to make required payments (mortgage, car payments, homeowner association fees, etc.). In other words, the debtor cannot survive bankruptcy by becoming delinquent on payments during the term and accruing new debts. Moreover, a plan that allows a debtor to keep her home may require the debtor to become current on past due amounts (arrears) on the mortgage during the plan term.

Each Chapter 13 case is assigned a case trustee, who is appointed by the U.S. Trustee to oversee and administer that particular case and to investigate the debtor's financial affairs. The Chapter 13 trustee and the creditors may file objections to the debtor's proposed Chapter 13 plan, and can move to dismiss the bankruptcy on certain grounds. Chapter 13 plans typically require the debtor to disclose any changes in employment and income and submit copies of federal and state tax returns to the

Chapter 13 trustee. Concealments and misrepresentations of income and assets inhibit the Chapter 13 trustee's oversight responsibilities, and prejudice creditors from asserting their rights and obtaining maximum recovery for delinquent debts.

U.S. bankruptcy law requires fair treatment among similarly-situated creditors and prohibits debtors from favoring some creditors at the expense of others. A Chapter 13 debtor cannot, for example, choose to repay the full amount of a personal debt to a close friend or relative but only pay back a fraction of her credit card debt. This is why payments are made to the Chapter 13 trustee, who in turn distributes payments to creditors according to bankruptcy law. To ensure fairness from the start, a Chapter 13 petition must disclose the identity of all creditors and whether the debtor made any payments to a creditor—including friends and family, referred to as "insiders"—within the 90 days preceding her bankruptcy filing. Section 547 of the Bankruptcy Code, also known as the "Preferential Payment Rule" authorizes the Chapter 13 trustee, with certain exceptions, to recover those payments from the creditor to ensure those assets are fairly distributed amongst creditors. 11 U.S.C. § 547. If the creditor is an insider, i.e., a family member or affiliate of the debtor, the Chapter 13 trustee may recover all payments made within the one year preceding the bankruptcy filing.

Chapter 13 debtors are generally prohibited from incurring new debts after filing a petition, as it would frustrate the purposes of bankruptcy for a debtor to amass new debts while discharging old ones. The debtor must obtain approval from the Chapter 13 trustee before incurring post-petition debts. If approved, the post-petition

5

debts may be incorporated into the Chapter 13 plan or paid after discharge. Because the debtor's disposable income is considered property of the estate during bankruptcy, a debtor is prohibited from repaying post-petition debts during the plan term without the Chapter 13 trustee's approval.

If a debtor completes all her payments under the court-approved plan, the Court must grant the debtor a discharge of all dischargeable debts approved or scheduled in the case. In many cases, a Bankruptcy Court's discharge order in a Chapter 13 case will result in the discharge of a substantial amount of unpaid unsecured debt. Unsecured creditors who do not receive full payment for outstanding debts cannot take any legal action to recoup the unpaid portion of the debt from a Chapter 13 debtor whose has been discharged.

## FACTS ESTABLISHING PROBABLE CAUSE

Mary COSSEY is a resident of Munster, Indiana, in the Northern District of Indiana. COSSEY is employed as a manager for Northern Indiana Public Services Company (NIPSCO). She has previously held leadership positions in the City of Gary, Indiana, as Director of Constituent Services and Executive Director of the Gary Housing Authority. At all times relevant to this investigation, COSSEY was a close associate of Individual A.

At all relevant times, COSSEY owned the title and deed to two real estate properties in northwest Indiana: a condominium in Munster, Indiana, where she resided; and a house in Gary, Indiana, which she rented to Individual B.

Between December 26, 2013, and January 16, 2019, COSSEY engaged in a scheme to defraud her creditors and the Chapter 13 bankruptcy trustee by misusing

and abusing the federal bankruptcy system. The purposes of this scheme was to prevent foreclosure of COSSEY's Munster residence, eliminate the majority of her debt on her Gary rental property, stay collection against all of her debts, and discharge over $125,000 in unsecured debt for pennies on the dollar—all without having to make any of the financial sacrifices required by Chapter 13 of the Bankruptcy Code. COSSEY accomplished these goals by lying on her Chapter 13 petition, withholding material information from the Chapter 13 trustee, and concealing over $250,000 in income and assets that were property of the bankruptcy estate. COSSEY further defrauded the trustee and creditors by maintaining a secret insider lending relationship with Individual A, and making over $231,000 in fraudulent preferential payments to Individual A during the term of her bankruptcy.

## A.   COSSEY's Chapter 13 Bankruptcy Case

On December 26, 2013, COSSEY filed a Petition for Chapter 13 bankruptcy, her third petition after two failed attempts in the previous three years.[1] The Chapter 13 trustee assigned to her case was Paul Chael. In her Petition, COSSEY listed over $450,000 in potential claims from creditors including: over $350,000 in potential claims from secured creditors (i.e., the mortgage on her Munster residence, the mortgage on her Gary rental property, and a judgment lien by Townhomes at White

---

[1]   COSSEY filed two previous Chapter 13 bankruptcy petitions, both of which were dismissed for material default and failure to make plan payments to the Chapter 13 trustee. COSSEY's first petition was filed on September 30, 2010, less than two months after an order of foreclosure sale was issued on her Munster residence. That petition was dismissed on October 12, 2011. Less than a year later, COSSEY filed a second petition on June 12, 2012, which was dismissed on December 10, 2013 for failure to make $51,150 in plan payments to the Chapter 13 trustee.

Oak Estates for unpaid association dues at her Munster residence); approximately $5,000 in unsecured priority claims for unpaid state taxes; and over $100,000 in unsecured claims. The unsecured claims section listed several credit card debts including a $17,517 debt to American Express.[2]

At the initial hearing with the Chapter 13 trustee, known in bankruptcy as the Section 341 hearing, COSSEY swore under oath that her Petition listed all of her assets and creditors. She affirmed she had no sources of income other than her salary from Gary Housing Authority and a failing real estate business that generated no income.

COSSEY's proposed Chapter 13 Plan was modified or amended over 10 times, and was not approved by the Bankruptcy Court until March 11, 2016, over two years into the bankruptcy. During the process, COSSEY received repeated objections to her proposed plans, principally from Trustee Chael, and also from certain creditors. Trustee Chael objected to several iterations of COSSEY's proposed plan on the grounds that the plan payments were too small, that COSSEY did not allocate enough of her disposable income towards plan payments, and that her plan was underfunded to satisfy her mortgage arrears. Ultimately, Trustee Chael and the Bankruptcy Court approved a plan in which COSSEY agreed to surrender her Munster residence, rather

---

[2]    COSSEY listed this debt in her two previous bankruptcy cases; and American Express had filed a creditor's proof of claim in both. After two failed Chapter 13 bankruptcies, American Express decided not to submit a third claim.

than cure her mortgage arrears, which in turn substantially reduced the required total sum of her plan payments.

COSSEY's plan provided for a "cram down" of her Gary rental property. Chapter 13 offers a debtor an opportunity to reduce or "cram down" the principal balance of a secured debt on non-residential property to the fair market value of the property. Put differently, a "cram down" allows a Chapter 13 debtor to alter the terms of a secured loan to the detriment of the secured creditor. In this case, Seterus, the servicer of the note on COSSEY's Gary rental property asserted a claim for $119,831.10 in unpaid debt. The Bankruptcy Court allowed COSSEY to cram down the principal balance on the debt to $26,000, and required to her to pay this amount plus 5.5% per annum interest, as well as monthly private mortgage interest payments to satisfy this debt. The remainder of the debt on the mortgage was converted to unsecured debt. As a result of the "cram down" order, COSSEY paid approximately $52,000 to keep the Gary rental property free and clear of any liens. More than $67,000 in remaining debt on the property was discharged.

The Bankruptcy Court's March 11, 2016 Order confirming the plan prohibited COSSEY from "incur[ring] any additional debt during the term of the plan without the prior written approval of the Trustee, except for emergency or routine medical, dental, optical, hospital, auto or home repair expenses." The Order further required COSSEY to "notify the Trustee immediately in writing of any change in the Debtor's address, or any termination, reduction of, or change in the Debtor's employment, or of any additional employment obtained." The confirmed Plan directed COSSEY to

"turn over to the Chapter 13 Trustee a copy of any federal and state tax returns filed by the debtor during each year of th[e] plan."

During the bankruptcy proceedings, Trustee Chael moved to dismiss the case three times—in July 2014, July 2016 and April 2017—for failure to make plan payments. Trustee Chael moved to dismiss another two times in November 2015 and January 2017 because COSSEY failed to submit her annual tax returns as required. The motions were withdrawn after COSSEY cured her defaults. During the bankruptcy, COSSEY provided Trustee Chael her 2013, 2014 and 2015 tax returns, but did not submit copies of tax returns for any subsequent years.

On January 16, 2019, the Bankruptcy Court discharged COSSEY's bankruptcy after successful completion of her Chapter 13 Plan. Trustee Chael's Final Report to the Bankruptcy Court declared that COSSEY made $81,278 in plan payments. The majority of those payments, approximately $52,000, was distributed to Seterus to satisfy her "cram down" payments and towards the unsecured portion of her debt on the Gary rental property. Non-priority unsecured creditors who filed claims received approximately 27% payment of their their debt. In total, $125,666.60 in unsecured debt was discharged with minimal payment. Based upon COSSEY's representations in her Chapter 13 Plan, the report identified her Munster residence, valued at approximately $250,000, as abandoned to satisfy claims secured by that property.

## B. False Statements and Omissions in Chapter 13 Petition

COSSEY signed under penalty of perjury that the information and statements provided in her Chapter 13 Petition were truthful and accurate and affirmed the

same under oath at her Section 341 hearing. However, several statements and representations in the Petition were materially false and misleading.

For example, in her declarations of Personal Property (Schedule B) and Exempt Property (Schedule C), COSSEY stated that she had no cash on hand and only $50 in a single BMO Harris Bank account. In fact, COSSEY had three open bank accounts with BMO Harris Bank when she filed her Petition: (1) account x8812, which COSSEY shared with Individual B; (2) account x0145, an individual savings account; and (3) account x2163, a business account under the name Level One Consulting. COSSEY's BMO Harris account x8812 had a negative balance as of the date the Petition was filed. COSSEY withdrew more than $4,000 from her undisclosed BMO Harris account x0145 in the days leading up to her filing.

In response to a question about financial interests in businesses, COSSEY declared, "Debtor is the sole owner of Level One Consulting LLC – Debtor never used this entity and it may have been dissolved." However, business records provided by Level One in response to a subpoena show that Level One was an active business for several years. In 2008-2009, Level One was retained to perform property management services for Safeguard Properties Management LLC; and in 2009, Level One received an IRS Form 1099 for over $38,000 paid under that contract. In 2013, Level One received three payments totaling $7,525.37 from her work on a political campaign: (1) a check for $4,665 dated March 12, 2013; (2) a check for $1,570 dated April 13, 2013, and (3) a check for $1,290.37 on November 27, 2013, one month before COSSEY filed her Chapter 13 Petition. All three checks were endorsed by COSSEY.

In the creditors sections (Schedules D, E and F), COSSEY did not disclose her personal lending relationship with Individual A. When she filed her Petition in December 2013, COSSEY did not have a direct line of credit with any credit card institutions. She was, however, an authorized user on Individual A's American Express credit card account and had incurred over $47,000 in charges to that account in 2013, the year preceding her bankruptcy filing. Individual A was legally responsible and liable to American Express to pay any charges incurred by COSSEY, because American Express had extended the credit to Individual A, not COSSEY. Individual A's American Express card was paid online out of Individual A's BMO Harris account ending x4111. Subpoena returns of COSSEY's and Individual A's BMO Harris accounts showed frequent and substantial transfers of money from COSSEY to Individual A. COSSEY transferred money to Individual A by teller deposits, signing over checks, and other means. In addition, Individual A's bank account revealed over 200 cash deposits totaling over $250,000 between January 2013 and September 2019. Substantial cash deposits were often made when Individual A's account balances were low, or just before credit card payments were due.

On December 18, 2019, Individual A was interviewed by federal agents about her financial relationship with COSSEY. Individual A told the agents that COSSEY had been an authorized user on Individual A's American Express account for more than ten years, that COSSEY was responsible for paying Individual A for all charges that COSSEY incurred, and that COSSEY consistently and timely paid what she owed Individual A "down to the penny." When asked about the cash deposits,

Individual A stated that she was aware of the cash deposits into her account and estimated 80% were made by COSSEY to satisfy her portion of the American Express credit card bills.[3]

COSSEY did not disclose Individual A as a creditor in her Petition or at any stage in her bankruptcy. COSSEY also did not disclose the payments she made to Individual A prior to her bankruptcy, as she was required to do in Section 3 of her Statement of Financial Affairs in the Petition. As explained above, Chapter 13 debtors are required to disclose payments made to ordinary creditors within the 90 days preceding the bankruptcy filing, and one year for payments to creditors who are "insiders," e.g., family members and close associates. COSSEY check-marked that she made no such payments to creditors. But bank records show that COSSEY transferred over $29,000 to Individual A through tellers deposits and other means in the year preceding her Chapter 13 Petition, and over $11,000 within the 90 days leading up to the bankruptcy filing.

## C. Employment History and Reported Income

When COSSEY filed her Chapter 13 Petition, she was employed by the City of Gary as Director of Constituent Services. COSSEY also received income from Gary Housing Authority in 2013. COSSEY accurately estimated her gross annual income

---

[3] Bank records show that most of the cash deposits were made at a BMO Harris branch in Gary, Indiana, located less than a mile from Individual A's residence. Federal agents interviewed four tellers from that branch. The tellers were all familiar with Individual A and recalled that Individual A made most of the deposits herself. The tellers recalled that COSSEY and Individual B made cash deposits into Individual A's bank account, but less frequently, which calls into question the veracity of Individual A's statements about the source of the cash.

from the City of Gary in 2013 as $80,000. She did not disclose her supplemental income from consulting, and her tax return from that year underreported her earnings from the Campaign.

During her bankruptcy case, COSSEY changed jobs twice and significantly increased her annual wages. She also performed consulting services and was registered as a real estate agent; but she typically claimed minimal income or losses from those businesses. COSSEY was obligated under the Plan to disclose changes in employment to Trustee Chael and submit annual tax returns to confirm her reportable earnings and assets.

During the plan term, COSSEY only submitted her 2014 and 2015 tax returns to Trustee Chael. Cossey's 2014 tax returns state that she earned approximately $50,000 in gross wages from the City of Gary and Gary Housing Authority. COSSEY also reported over $50,000 in consulting fees including: $42,000 from the City of Gary; $5,000 from Gary Indiana New Day Foundation; and $3,076 from a political campaign. COSSEY claimed she profited only about $14,000 total from all of her consulting fees after deducting business expenses. In 2015, COSSEY was hired by Indiana American Water Company. She reported approximately $80,000 in gross wages that year. She also reported $10,000 in consulting fees from the political campaign. COSSEY claimed she suffered $16,000 in losses from her real estate agent practice and her Gary rental property in 2015.

COSSEY was required to, but did not, submit copies of her 2016 and 2017 tax returns to Trustee Chael. Her tax returns from those years show an increase in wage

earnings to approximately $101,000 in 2016 and $107,000 in 2017, due to a promotion COSSEY received from American Water. COSSEY claimed business losses each of those years from her real estate agent business and rental property. COSSEY did not inform Trustee Chael of her promotion or increase in salary. COSSEY withdrew more than $16,000 from retirement accounts in 2016 and 2017. She did not report these disbursements on her tax returns and did not inform Trustee Chael of this supplemental income.

COSSEY did not file her 2018 tax return until December 2019, nearly 11 months after her Chapter 13 case was discharged. In February 2018, COSSEY was terminated from American Water and received approximately $58,000 in severance pay, plus nearly $20,000 in performance bonuses as part of her severance agreement. The next month, COSSEY was hired by NIPSCO at a salary comparable to what she was receiving at American Water. That year, she cashed out over $31,000 from pension and retirement accounts. COSSEY's reported taxable income in 2018 was over $190,000. COSSEY did not inform Trustee Chael of her change in employment or significant increase in disposable income in 2018.

D.   **Concealed Income and Assets**

Based on the investigation to date and representations to federal agents by Individual A, COSSEY concealed and failed to report over $250,000 in income and assets from Trustee Chael and her creditors during the five-year bankruptcy term, including the following:

- More than $95,000 in cash

- More than $5,000 in consulting fees from a campaign and foundation

- More than $78,000 in severance pay from American Water

- More than $54,000 in retirement and investment account withdrawals

- More than $17,000 in rental income

- Nearly $8,000 in car title loans

- More than $3,000 in real estate commissions

1.   <u>Cash Deposits</u>

The most substantial source of undisclosed income was cash deposits by COSSEY into Individual A's BMO Harris account x4111. Between January 1, 2014 and December 31, 2018, over 150 cash deposits were made into Individual A's bank account totaling approximately $187,000. Individual A estimated that 80% of the cash deposits were made by COSSEY to satisfy her portion of the American Express credit card bill.

Based on the investigation of financial records and the agents training and experience, there is probable cause to infer that the large and frequent sums of cash deposited by COSSEY came from an outside or non-legitimate source. COSSEY did not obtain the cash from her reported wages and earnings. COSSEY's wages were paid by direct deposit into her BMO accounts and her consulting fees by check, which were deposited in her or Individual A's accounts. It cannot be concluded that the cash was withdrawn from COSSEY's accounts and deposited into Individual A's account. The number and frequency of cash withdrawals from COSSEY's bank account do not come close to matching the large sums of cash deposited into Individual A's BMO

Harris account x4111.[4] Moreover, COSSEY's banking activity indicates that she also transferred money from her accounts to Individual A's account by teller deposit or inter-account transfers, which made the large cash deposits even more unusual.

Because these cash proceeds were used to pay personal consumer credit card debts incurred by COSSEY, they constitute supplemental income or assets that were property of the bankruptcy estate. The government conservatively estimates that COSSEY concealed the following sums of cash income or assets during each of the plan term years:

| Year | Undisclosed Cash Income/Assets[5] |
|------|-----------------------------------|
| 2014 | negligible |
| 2015 | $32,000 |
| 2016 | $13,000 |
| 2017 | $20,000 |
| 2018 | $30,000 |
| **TOTAL** | **$95,000** |

2. Political Campaign and Foundation Work

COSSEY underreported at least $5,000 in income she received from her work on a political campaign in 2014 and 2015. In 2014, COSSEY reported on her tax

---

[4] During the five-year bankruptcy term, COSSEY withdrew approximately $15,000 more in cash from her various accounts than she deposited.

[5] The above estimates assume that all net cash withdrawals from COSSEY's bank accounts were deposited into Individual A's BMO x4111 account, and therefore did not come from an external undisclosed source, even though the timing and amount of these corresponding withdrawals and deposits do not support this favorable assumption.

return that the campaign paid her $3,076 in consulting fees. Bank records show that the campaign issued COSSEY two checks totaling $5,116.20, which was identified in the publicly-filed campaign finance report as consulting and fundraising services. On March 14, 2014, COSSEY received an expense reimbursement check from the campaign in the amount of $1,031.78 for "gala reimbursement"; but the campaign finance report listed that expense as only $250. In 2015, COSSEY received $12,500 in consulting fees from Gary Indiana New Day Foundation ("Gary New Day"). However, the campaign was the actual source of the funds, as described below. COSSEY also received $1,000 via phone transfers from the campaign account that year. In her 2015 tax return, COSSEY only reported $10,000 income from the campaign and no income from Gary New Day.

Gary New Day purported to be a charitable organization whose stated mission was to "address the impact that poverty has had on Gary, Indiana by coordinating the efforts of civic, social, faith and other organizations to assist local citizens." The foundation was registered in the State of Indiana in November 2011 both as a for-profit domestic corporation and as a non-profit corporation. Gary New Day registered as a tax-exempt charitable organization under Section 501(c)(3) of the Internal Revenue Code, but its status was revoked in May 2014 for failure to file required annual reports for three years. The registered business address was COSSEY's Gary rental property, and the registered agent was Individual B.

Based upon records received from Gary New Day and other sources, the foundation was largely inactive after October 2014. Nevertheless, between November

2014 and May 2015, COSSEY received $17,500 in gross income for purported consulting work from the foundation. She received $7,500 of that amount after February 24, 2015, when the foundation was administratively dissolved by the State of Indiana and ceased to exist as a legal entity. In response to a subpoena, Gary New Day provided no records indicating that COSSEY had a formal consulting agreement with the foundation or that she performed any legitimate work for the foundation. In her tax returns, COSSEY claimed she profited only $1,660 for this work after business expenses.

Adding to the suspicious nature of this compensation, Gary New Day did not have sufficient funds or donations to pay COSSEY $12,500 in 2015. Instead, bank records indicate that checks were issued from the political campaign to the foundation and the payments were identified as charitable "contributions" in the campaign finance report. COSSEY then received stipend checks from the Gary New Day account in the same amounts, signed by Individual A. COSSEY deposited most of the proceeds back into Individual A's account to pay her American Express credit card expenses.

3.    <u>American Water Severance Pay</u>

As explained above, COSSEY's Chapter 13 plan required her to disclose all changes in employment to Trustee Chael. COSSEY did not disclose to Trustee Chael that she was terminated by American Water in February 2018 and received over $78,000 as part of her severance agreement. Nor did she disclose that she received a new position with NIPSCO at a comparable salary.

4.    Retirement and Investment Account Withdrawals

Between 2016 and 2018, COSSEY withdrew approximately $54,000 from retirement and investment accounts. Once withdrawn, these funds were no longer protected by bankruptcy law and became property of the Chapter 13 estate, and subject to disbursement to creditors. COSSEY did not disclose these withdrawals to Trustee Chael.

On February 10, 2016, COSSEY opened a new BMO Harris savings accounts ending in x9012. A week later, COSSEY withdrew and transferred $2,500 from an MG Trust retirement account directly into that new account. COSSEY transferred most of the funds to Individual A, and then closed the account after six months. Cossey did not report this distribution on her tax returns.

In September 2016, COSSEY withdrew $3,500 from a Merrill Lynch retirement account and deposited the funds into her undisclosed BMO Harris x0145 savings account. The following year, in July 2017, COSSEY withdrew over $10,000 from the same Merrill Lynch retirement account. COSSEY deposited approximately $3,800 of the proceeds into Individual A's BMO Harris x4111 account and the remainder into her own x0145 account. Cossey did not report these distributions on her tax returns.

In September 2016, COSSEY opened a new bank account ending x1093 with JP Morgan Chase, where she deposited much of the supplemental income that she concealed from Trustee Chael. In January 2018, COSSEY withdrew over $1,900 from her Indiana Public Retirement System account and deposited the funds into her

20

Chase bank account. In February and August 2018, she wired over $5,000 in American Water stock options from an E-Trade brokerage account to her Chase bank account. In February 2018, COSSEY withdrew $10,000 from a Pershing LLC retirement account. Six months later, COSSEY withdrew $6,400 from a Fidelity retirement account. She deposited the proceeds from both withdrawals into her Chase bank account. On November 5, 2018, one month before Trustee Chael issued his Final Report, and two months before she received her Chapter 13 discharge, COSSEY withdrew $11,000 from a Traveler's insurance account and deposited the funds into her Chase bank account.

5.    Rent Payments from Munster Residence

COSSEY concealed $17,675 in rental income from her Munster residence. In January 2018, COSSEY's personal friend moved into her Munster residence and agreed to pay COSSEY on a monthly basis to contribute to household bills and expenses. Bank records show that in 2018 COSSEY's friend paid her a total sum of $17,675 via checks. None of these rental payments were disclosed to Trustee Chael or on COSSEY's tax returns, despite the fact that COSSEY repeatedly reported her Gary property as a rental property with a business loss.

6.    Illinois Title Loans

In 2017, COSSEY obtained two title loans borrowed against her 2009 Dodge Nitro without seeking permission from Trustee Chael. On January 11, 2017, COSSEY obtained a $3,985 title loan at a 149.17% interest rate. The next day, COSSEY deposited the check into Individual A's BMO Harris x4111 account.

21

COSSEY repaid the loan ahead of schedule on October 12, 2017 plus $1,900 interest. Immediately after, on November 8, 2017, COSSEY obtained a second title loan for $3,985 borrowed against the same car, at the same interest rate, which she fully paid off ahead of schedule, plus $1,800 interest by April 20, 2018. COSSEY did not report the $7,970 in title loans she received, nor the preferential payments to the title lender, to Trustee Chael.

7.   Real Estate Commissions

COSSEY's 2016 tax return reported no income and $2,150 in business expenses from her real estate practice. Records show that COSSEY earned at least $3,000 in commissions from McColly Real Estate that year, which she concealed from Trustee Chael.

E.   **Fraudulent Post-Petition Debt and Preferential Payments**

As described above, COSSEY fraudulently concealed her personal debt relationship with Individual A in her Petition and throughout her bankruptcy. Individual A acted as a personal lender and enabled COSSEY to spend extravagantly through Individual A's American Express credit card account and hide large sums of disposable income from the Chapter 13 trustee, which if disclosed, would have dramatically altered the amount of recovery for COSSEY's creditors. In return, Individual A received preferential treatment and full payment for COSSEY's accruing debts.

COSSEY initially defrauded Trustee Chael by failing to disclose that she paid Individual A over $29,000 for personal debts incurred from American Express charges

in the year before she filed her Petition. If she had, Trustee Chael would have been entitled to recoup these funds from Individual A for the bankruptcy estate. After she filed her Petition, COSSEY continued to incur and pay off a substantial amount of post-petition personal debts from Individual A.

Between January 1, 2014, and December 31, 2018, COSSEY charged over $240,000 to Individual A's American Express credit card broken down by year as follows:

| Year | Amount |
|------|--------|
| 2014 | $44.191.52 |
| 2015 | $45,956.90 |
| 2016 | $52,068.35 |
| 2017 | $47,188.14 |
| 2018 | $54,590.80 |

These charges included substantial expenditures on luxury items that are not permitted in a Chapter 13 plan budget. For example, during the bankruptcy term, COSSEY spent over $45,000 on clothing, jewelry and accessories, including: (a) over $4,800 on Gucci handbags and products; (b) over $5,800 on shoes and apparel at Neiman Marcus; (c) a mink jacket from Saks Fifth Avenue in New York City costing nearly $2,100; and (d) over $3,000 in jewelry and crystal. In contrast, COSSEY's Chapter 13 Petition budgeted $70/month for clothing, laundry and dry cleaning combined. Similarly, COSSEY budgeted $50/month for personal grooming yet charged over $5,700 to the American Express card for beauty and spa services.

23

Even though she agreed to surrender her Munster property in order to obtain Trustee Chael's approval for the Chapter 13 plan, COSSEY spent over $7,500 on home repair and furnishings starting with a $1,900 purchase for floor coverings from Lumber Liquidators in October 2017. These home improvements prompted COSSEY's condo association to file a motion questioning her intent to surrender her Munster property. [6]

COSSEY spent over $25,000 on travel (airlines, hotels, dining, and related expenses) during her five year bankruptcy. The vast majority of travel occurred from 2016 to 2018, when COSSEY did not report any income from consulting work, and therefore cannot attribute the travel to business purposes. COSSEY's travels

---

[6] COSSEY's fraudulent bankruptcy allowed her to keep her Munster residence without paying the more than $128,000 arrears on the debt for that property as part of her Chapter 13 plan. COSSEY's multiple bankruptcy petitions stayed the foreclosure sale of the Munster property. When the Bankruptcy Court approved the Chapter 13 plan in March 2016, it also removed the stay on foreclosure proceedings because COSSEY agreed to surrender the property rather than pay arrearages. On April 2016, the bank holding the mortgage note filed a new action to foreclose on the Munster property. On or about March 2018, the note was assigned to a new financial institution, Wilmington Savings Fund Society FSB.

On May 7, 2018, while the state foreclosure action was pending, White Oak Estates filed a motion to dismiss COSSEY's bankruptcy. The condo association reported that COSSEY was making capital improvements on her home, which indicated she did not intend to surrender her residence. On June 7, 2018, the Bankruptcy Court denied White Oak's motion, on the grounds that the property was surrendered under the confirmed Chapter 13 plan, and the association could prosecute its lien in rem via foreclosure.

On December 12, 2018, after Trustee Chael submitted his Final Report approving discharge of COSSEY's bankruptcy, Wilmington Savings moved to dismiss the foreclosure action, stating that COSSEY had renegotiated the terms of her mortgage. The Lake County Superior Court signed the dismissal order the same day. Consequently, COSSEY kept her Munster residence and resides there today.

included at least five trips to Las Vegas, Nevada and a vacation in Puerto Rico. On November 8, 2018, just two months before her Chapter 13 case was discharged, COSSEY charged $3,372.60 to the JW Marriott Hotel in Los Angeles, California.

During the bankruptcy term, COSSEY also made over $40,000 in payments to BMW Financial Services directly from her BMO bank accounts. COSSEY never obtained approval from Trustee Chael to purchase or finance a BMW vehicle.[7]

Bank records establish that between January 1, 2013 and December 31, 2018, COSSEY made approximately 60 teller deposits transferring over $102,000 in funds to Individual A's BMO Harris account x4111. The funds were transferred from COSSEY's two BMO Harris accounts x8812 and x0145 and her Chase account x1093. During this time, COSSEY also signed over and deposited more than $34,000 in checks into Individual A's account. Based on Individual A's statements to law enforcement, COSSEY also deposited nearly $95,000 in cash to satisfy her ongoing personal debt. These payments add up to approximately $231,000, roughly equivalent to the $240,000 in American Express charges that COSSEY incurred during the bankruptcy term. During the bankruptcy plan term, COSSEY paid nearly three times more to Individual A than Trustee Chael, and her payments to Individual A exceeded her Chapter 13 plan payments by nearly $150,000.

Based on my knowledge and experience, I am aware that American Express is headquartered in New York, NY, and that online payments from accounts in banks

---

[7] In June 2018, COSSEY requested permission to purchase a new car and was informed she needed to meet certain conditions first. The approval was never granted.

such as BMO Harris to American Express would involve interstate wire transmissions.

## CONCLUSION

Based on the foregoing facts and my experience and training, I submit there is probable cause to conclude that between on or about December 26, 2013 and January on or about January 16, 2019, MARY COSSEY committed violations of 18 U.S.C. § 1343.

FURTHER AFFIANT SAYETH NAUGHT.

Respectfully submitted,

Jonathan Pressnell
Special Agent
Federal Bureau of Investigation

*Considered and executed by reliable electronic means pursuant to Federal Rule of Criminal Procedure 4.1.*

Subscribed and sworn to before me on this 4th day of August, 2020.

s/John E. Martin

John E. Martin
United States Magistrate Judge